Millihan, J.,
delivered the opinion of the Court.
*197 In this case, three causes -were consolidated, and heard together. They all present the same general question, and must he controlled by the same decision.
The contest arises upon their notes executed respectively by the complainants, to the intestate, Jacob House, in his. life time, for certain slaves, by him, at public auction, sold, to the complainants. The sale was in 1855, and the intestate died in 1860. Administration was granted on his "estate the same year he died, and soon thereafter, the complainants renewed the notes in the hands of the personal representative.
In the spring of 1861, the administrator brought three separate suits upon these notes. One against the complainant, J. W. House; one against William Pett, a son-in-law of the intestate; and the other against William Powell, who is also a son-in-law of Jacob House, deceased; and both of whom are complainants in the causes, which are consolidated and heard with this cause. The defendants in the actions at law, each plead to the declarations. The complainant House, pleaded, “in short,” “nel debit, payment and set off;” but upon the trial, which was postponed in consequence of the war until 1865, he withdrew his pleas, and suffered judgment to go against him by confession for the sum of $5,201.39, with costs of suit, The defendant, Pett, by way of defense to the action against him, relied on the unsoundness of the negroes for which his note was executed, and that his wife was a dis-tributee in the intestate’s estate, and therefore no judgment ought to be rendered against him until the dis-tributee’s interest of each heir had been ascertained. *198 Powell, in Ms plea, relied on the fact that compound interest had, in the renewal of his note, been computed against him, and also upon the general defense set up by 'the defendant Pett. These pleas were unavailing, as might readily have been supposed, on the trial, and judgment was rendered against Pett, for the sum of $8,537.80, and against Powell, for: $3,187.83, with costs in each case.
Under this general state of facts, their bills were filed in December, 1865, more than ten years after the execution of the original notes, to have the price of the negroes for which the notes were executed, declared advancements made by the intestate, in his life time, to the complainants. The administrator, and a portion of the heirs, resist the object of the bill, and insist that the judgments at law are bona fide debts against the defendants; and that the notes upon which they were founded, cannot be regarded as advancements. The Chancellor decreed for the complainants; and an appeal is prosecuted to this Court.
It is shown in the proof, that in 1855, Jacob House, being advanced in years, and the owner of a considerable number of slaves, determined to sell off a portion of them, reserving for himself, such as he supposed were necessary for his comfort and support, for the remainder of his life. To this end, he caused public notice, by printed hand-bills, of time and place of sale, to be given, and on the day appointed, a large crowd was in attendance. The sale was public, and open to all, without restraint or limitation upon the bidders. Every bid was cried by the auctioneer, and each slave *199 knocked off to tbe highest bidder. But it so happened that the children and sons-in-law bought all the slaves that were sold.' And after the sale, the several purchasers executed their notes for the property purchased,, without security, due and payable twelve months from date. Bills of sale were executed to each purchaser, with warrantees of title, but without warrantees of soundness, and the slaves delivered.
It further appears, that the old man, prior to the sale, repeatedly said, he desired all his children to share equally in the distribution of his property, and that he was too old to manage his slaves, and he did not desire to assume the responsibility of dividing them among his children, and that he had determined to put them up at public sale, and if they wanted any of them, they could buy such as they wanted, and if not, some one else would buy them.
It also appears that he said, he did not know that he would ever collect the notes executed by his children for 'the slaves, but he would hold them as receipts to show the amounts they had received of his estate, and if he should need the money, he could collect so much of it as his necessities required.
Now, it is insisted in argument, that these facts, which are in accordance with the averments in the bill, show that the sale was a mode adopted . by the old man, of advancing his children, and that he never intended to fix upon them an obligation to pay the notes executed with the accruing interest.
The difference between the claim of the complainants and the demand of the administrator, is very ma *200 terial; for, if tbe price of tbe slaves purchased by tbe former, are to be regarded as advancements, they will be estimated in tbe distribution of tbe estate, at tbeir value, or, tbe price bid at tbe time of tbe sale; but, if tbe judgments are treated as debts, they will, of course, carry tbe accumulated interest on tbe notes, and also, sucb as may bave accrued on tbe judgments since tbeir rendition: Burlan vs. Dickson, 3 Yer., 112-122.
But, tbe question recurs, whether tbe grounds relied on in tbe bill — all other questions out of tbe way— are sufficient to constitute the sale of these slaves an advancement, and to justify a Court of Chancery to charge them as sucb, against tbe complainants, in tbe distribution of tbe estate. And we think it clear they cannot be so treated. “An advancement, properly speaking, is a gift by a parent to bis child, by anticipation, in whole or in part, of what it is supposed tbe child would be entitled to on tbe death of tbe parent Caertbon, Adm’r, vs. Coppedge et al., 1 Swan, 487; 17 Mass. R., 358; Vaden, Adm’r, vs. Hance et al., 1 Head, 301.
There is nothing in this record to show that tbe intestate intended tbe sale of bis slaves, at public auction, as a mode of giving to bis children, sucb of them as they, or any of them, might choose to purchase. On tbe. contrary, it is manifest that it was the old man’s intention, if any of bis children saw proper to give more for them than any one else, they could become the purchasers, and not otherwise. If be intended tbe slaves, after tbe purchase" by bis children, as gifts, and not as constituting debts, why did be ex *201 act notes from the purchasers, and execute to each, bills of sale without warrantees of soundness ? The fact that he said he never expected to call on his children for the money, and that he would hold the notes as receipts, amounts to nothing; for he reserved to himself the right, if his necessities required, to collect them, or such parts thereof, as he might need. The whole transaction is replete with evidence that he did not intend the slaves as gifts; and this view corresponds perfectly with the acts and conduct of the complainants. Eor ten years they treated the notes as debts against them, and after having renewed them in the hands of the administrator, and suffered judgments g,t law to go against 'them, without any substantial defense, they cannot, at this late date, under the circumstances of this case, come into a Court of Chancery, and avail themselves of the grounds set up in the bill.
The decree of the Chancellor must be reversed, and decree entered here in accordance with this opinion, with costs.